**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA**

|  |  |
|---|---|
| In re | |
| **JODY CLYDE JACKSON** and **EILEEN FRANCES JACKSON**, | Case No.  **10-61020-7** |
| Debtors. | |
| **FARM SERVICE AGENCY**, | |
| Plaintiff. | |
| -vs- | |
| **JODY CLYDE JACKSON** and **EILEEN FRANCES JACKSON**, | Adv No.  **10-00074** |
| Defendants. | |

## MEMORANDUM OF DECISION

At Butte in said District this 10th day of May, 2011.

In this adversary proceeding Plaintiff United States of America, Farm Service Agency

("FSA") objects to the Debtors/Defendants' discharge pursuant to 11 U.S.C. § 727(a)(5)[1] for

failure to explain satisfactorily loss or deficiency of assets,  and seeks exception from discharge

of a total of $75,300.00 from Debtors' discharge under 11 U.S.C. § 523(a)(6) for willful and

malicious injury to FSA's security.  Defendants answered denying the material allegations of the

---

[1]The approved Pretrial Order refers to § 727(a)(5) as Count II, but the elements set forth
on page 5 are from § 727(a)(2), which counsel for FSA admitted at the trial.  The Court at trial
struck the § 727(a)(2) elements listed at the bottom of page 5 of the Pretrial Order (Docket No.
15) as "(a)," "(b)," and "(c)."

1

complaint.  Trial in this adversary proceeding was held at Missoula on February 23, 2011.

Defendants Jody Clyde Jackson ("J.C.") and Eileen Frances Jackson ("Eileen") (together

"Jacksons" or "Debtors") each appeared and testified, represented by attorney Andrew W. Pierce

("Pierce") of Missoula.  FSA was represented by assistant U.S. attorney George F. Darragh Jr.

("Darragh").  FSA also called to testify John Walkup ("Walkup"), Dave Pitts ("Pitts"), and Alan

Jenne ("Jenne").  FSA's Exhibits ("Ex") 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18,

19, 20, 21, 22, 23, and 24, and Defendants' Ex. A, B, C, D, E, F, G, H, and I, were admitted into

evidence.  At the conclusion of the parties' cases in chief the Court took the matter under

advisement.  After review of the parties' pretrial memoranda, the record and applicable law, this

matter is ready for decision.

This Court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334(b).

FSA's complaint to determine dischargeability of its debt and objecting to Debtors' discharge are

core proceedings under 28 U.S.C. §§ 157(b)(2)(I) & (J).  For the reasons set forth below, a

separate Judgment will be entered dismissing FSA's objection to discharge under § 727(a)(5),

but excepting the sum of $7,000 from the Defendants' discharge under § 523(a)(6) for willful

and malicious injury to FSA's.  This Memorandum includes the Court's findings of fact and

conclusions of law under F.R.B.P. 7052 (applying FED. R. CIV. P. 52 in adversary proceedings).

## FACTS

The Pretrial Order (Dkt. 15) sets forth the following agreed facts:

(a) On June 19, 2000, the United States, acting by and through the Farmers
Home Administration (FmHA), predecessor agency to the Farm Service Agency
(FSA), USDA, pursuant to the Consolidated Farm and Rural Development Act, 7
U.S.C. § 1921, loaned Rocky Mountain Hatchery and Game Birds, LLC, J.C.
Clyde Jackson, and Eileen Frances Jackson a Farm Ownership (FO) loan in the

sum of $112,000.00 (Loan 41-02). Loan 41-02 was reamortized on April 30, 2002 in the amount of $119,992.95 (Loan 41-05). Loan 41-05 was reamortized on January 30, 2004 in the amount of $130,512.88 (Loan 41-07).

(b) On June 19, 2000, the United States, acting by and through the Farmers Home Administration (FmHA), predecessor agency to the Farm Service Agency (FSA), USDA, pursuant to the Consolidated Farm and Rural Development Act, 7 U.S.C. § 1921, loaned Rocky Mountain Hatchery and Game Birds, LLC, J.C. Clyde Jackson, and Eileen Jackson the sum of $112,700.00 in the form of an Operating (OL) loan.  (Loan 44-01).

(c) On March 30, 2001, the United States, acting by and through the Farmers Home Administration (FMHA), predecessor agency to the Farm Service Agency (FSA), USDA, pursuant to the Consolidated Farm and Rural Development Act, 7 U.S.C. § 1921, loaned Rocky Mountain Hatchery and Game Birds, LLC, J.C. Clyde Jackson, and Eileen Jackson the sum of $14,200.00 in the form of an Operating (OL) loan.  (Loan 44-03).

(d) Loans 44-01 and 44-03 were consolidated for a term of 15 years on April 30, 2002, by which a single new Promissor [sic] Note was executed by Rocky Mountain Hatchery and Game Birds, LLC, J.C. Clyde Jackson, and Eileen Jackson. (Loan 44- 04).

(e) In addition to two real estate mortgages on real property owned by Defendants, Rocky Mountain Hatchery and Game Birds, LLC, J.C. Clyde Jackson, and Eileen Jackson executed a series of Security Agreements, the latest of which is dated December 1, 2003, granting the Farm Service Agency a security interest in all farm and other equipment and all brood stock owned by them as security for the above described promissory notes.

(f) The Farm Service Agency perfected its security interest in the above described chattel property by filing a Finance Statement in the Office of the Montana Secretary of State on June 20, 2000, at document 60061114. The Financing Statement was amended on November 21, 2003, at document number 75613587. This lien filing lapsed on June 20, 2005. The Farm Service Agency subsequently perfected its security interest in the above described chattel property once again by filing a Financing Statement in the Office of Montana Secretary of State on February 5, 2007 at document 90831425. This lien filing remains effective until February 5, 2012.

(g) The agency also perfected its security interest in the above described chattel property by filing another Financing Statement in the Office of the Montana Secretary of State on February 5, 2007, at document 90831304. This U.C.C. lien filing also remains effective until February 5, 2012.

3

(h) Rocky Mountain Hatchery and Game Birds, L.L.C., J.C. Clyde Jackson, and Eileen Jackson are in default of the promissory notes and real estate mortgages due to failure to make payments.

(i) On August 15, 2008, The United States filed a complaint seeking foreclosure on its security interest on the above referenced promissory notes. Case No. 08-CV-00120-DWM.

(j) On March 20, 2009, the United States District Court for the District of Montana granted foreclosure against Rocky Mountain Hatchery and Game Birds, LLC, J.C. Clyde Jackson, and Eileen Frances Jackson in the amount of $268,079.06 and accrued interest in the amount of $49,546.38, for a total amount owing $317,625.44. Case No. 08-cv-00120-DWM. The court further ordered that the U.S. Marshal sell at public auction all real property and chattel.

(k) Due to insufficient proceeds from the U.S. Marshal's sale, a deficiency judgment was entered against Defendants and for the United States on February 12, 2010. Case No: 08-120-M-DWM. This judgment entitled the United States to a total deficiency of $217,715.98.

(l) In the present Chapter 7 case, Defendants have scheduled the deficiency judgment in Schedule F as debt due to Plaintiff.

Additional facts were provided from witness testimony and exhibits admitted at trial.

J.C. and Eileen Jackson are married and had three sons, one who is deceased and another who is 17-years old, autistic, and lives with them.

J.C. moved to Montana after serving in the U.S. Navy. In 1993 he and Eileen started a game farm and hatchery raising pheasants and selling eggs. In addition to working on their pheasant farm, Eileen is self employed and makes weighted blankets for special needs people. J.C. testified that the game farm did well initially and they went to FSA to get financing to expand.

**Pheasant Farming.**

Jenne described pheasant operations in general as having two phases: 1) Raising

4

pheasant chicks and eggs for sale; and 2) raising pheasants to breed. J.C. described pheasant raising operations in more detail. He testified that pheasants are raised to remain wild[2], and unlike chickens pheasants are very aggressive. J.C. testified that a hen may be bred 17 times in a single day, and that some birds get "really torn up." He described the market for their pheasant farm as other pheasant growers, state bird release programs in Montana and the northwest United States, hunting preserves, and dog breeders for their older birds.

J.C. testified that healthy birds which survive their first year are kept for a second year, but that they must constantly destroy birds, which they disposed of in a composting system located on their real property. He testified that, during a pheasant's second year of life, its fertility and egg production decreases slightly. In the third year of a pheasant's fertility and egg production drop significantly and a hen is considered "spent." J.C. testified that spent hens have value, but only if you can sell them. He explained that a dog trainer might buy 2 or 3 spent birds at a time[3].

J.C. testified that birds in their third year of life have a high probability of contracting tuberculosis, and that they cannot not risk tuberculosis wiping out their entire flock, so every year they would destroy spent hens and other birds in numbers ranging from 1,200 to 1,800 birds. Jenne admitted on cross examination that a pheasant's value declines once it is "spent," but he did not know the value of a pheasant at each stage of its life cycle.

---

[2]J.C. testified that the pheasant farm was under the jurisdiction of the state fish and game commission instead of agriculture because the pheasants were considered wild.

[3]Dog trainers prefer birds who have lost their feathers so they cannot fly. The trainer releases the bird for the dog to pursue and retrieve.

**The FSA Loan.**

Ex. 8 is a loan history for Jacksons' Rocky Mountain Hatchery and Game Birds, LLC ("RMH") from 8/19/2000 through 1/1/2011, and shows an ending balance of $174,478.35. Jenne testified that he did not become involved with Jacksons' FSA loan until they were in the process of winding down their pheasant operations. He did not know the exact number of pheasant farms in Montana, but he testified that he knew of at least two others besides Jacksons'.

J.C. testified that they provided FSA with projections as part of their loan application. Ex. 22 is a "Farm & Home Plan" signed by Jacksons and the FSA county supervisor dated 12/12/99. Ex. 22 lists Jacksons' total assets as $138,400 and total liabilities as $100,614 on page 2. At page 4 Ex. 22 lists the numbers of hens, chicks, eggs, spent birds and replacement birds. J.C. testified that these were projections of what they would produce and sell, and that they had to estimate these every year for FSA. Jenne disagreed, and stated that these numbers were representations by Jacksons of what they actually had.

Ex. 4 is an appraisal of chattel property for FSA's loans dated as of May of 2000, and includes an itemized list and photographs of collateral. Ex. 4 lists numbers of hens and cock pheasants with a total value of birds stated in the sum of $50,338, plus equipment itemized[4] and totaling $41,110, for a total of $91,488. Ex. 4 lists the total debt in the amount of $84,000, and states that the remaining equity at the time of the appraisal is $7,498.

Ex. 9 is a series of promissory notes and other documents naming RMH as borrower. The promissory notes in Ex. 9 are signed by both Jacksons as members and individually, and are

---

[4]The equipment includes incubators, hatchers, lamps, heaters, fans, pens, coops, feeders, watering systems, a pickup, trailer, etc.

dated beginning 6/19/00.  Ex. 10 also includes promissory notes signed by Jacksons as members and individually dating back to 6/19/00.

**Jackson's Operations.**

J.C. testified that their business plan and projections called for them to accumulate a pheasant flock size of 3,500 pheasants, but that they never reached that number.  He testified that their first year they had pheasants for breeding, but they experienced a fire on their property which affected their flock, and in 2001 their hens did not lay eggs.  He testified that they had to kill 2,000 to 3,000 birds in 2001.  J.C. testified that the terrorist attacks of 9/11/2001 affected their ability to ship boxes of eggs by airfreight, and because of that they had to throw away between 30,000 to 40,000 eggs.  They received compensation for smoke damage from FEMA in 2001, and J.C. testified that they paid some of that compensation to FSA.

J.C. testified that in 2003, their customer orders decreased and their costs rose.  They were not able to pay taxes or their FSA loan payments in 2003, and they could not replace new hens for the year 2004.  Eileen testified that they could tell beginning in 2003 that their pheasant operation was going downhill, or "going bust."

Jenne testified that, initially, the Jacksons' operating loan and chattel loan may not have been cross-collateralized, but that when the loans were restructured cross collateralization took place and FSA had security for both loans.  Ex. 12 is a "Security Agreement (Chattels and Crops)" dated December 1, 2003.  On the first page of Ex. 12 it provides:

> **DEBTOR GRANTS** to Secured Party a security interest in Debtor's interest in the following described collateral, including the proceeds and products thereof, accessions thereto, future advances and security acquired hereinafter (herinafter [sic] referred to as "collateral"); provided however *the following description of specific items shall not in any way limit the collateral covered by this instrument*

7

and the Secured Party's interest therein ....

(Emphasis added).

Ex. 12 includes at the end an itemized list of farm and hatchery equipment, similar to Ex. 4 but including a Gehl Loader, Miller Bobcat Generator/Welder, and another generator.  Ex. 12 also lists as FSA's security:  All crops and other plant or farm products of Rocky Mt Hatchery (Item 1); farm equipment (Item 2); livestock, "including but not limited to . . ." 3,500 breeding pheasant hens in the age range "1-2", 350 breeding cocks aged 1-2, and 2,000 mature birds to sell aged 1 year (Item 3); and accounts, deposits, inventory and intangibles (Item 4).  On page 6, Section IV, Ex. 12 provides that upon any default, FSA may, among other things, "(b) enter upon the premises and cultivate and harvest crops, take possession of, repair, improve, use, and operate the collateral . . . for the purpose of protecting or preserving the collateral or this lien, or preparing or processing the collateral for sale, ...."

Jenne and Pitts testified that Ex. 12 gave FSA all of the Jacksons' pheasants, including 3-year old birds, as security for FSA's loans.  Jenne testified that the Jacksons gave FSA a $10 per pheasant unit price, making the value of FSA's bird security $58,500.  J.C. testified that they had discussed with FSA's employees that 3-year old pheasants are worthless, except to dog breeders, and had to be destroyed because of the high risk of tuberculosis which 3-year olds posed to the entire flock.  Because of the threat of tuberculosis, J.C. testified, there was no way 3-year old birds could be on the property, and so 3-year olds were not included as collateral on Ex. 12.

Ex. 16 is a "Farm and Home Plan" signed by Jacksons dated 12/19/03.  Jenne described Ex. 16 as a combination of balance sheet and cash flow statement of a borrower's operation for one year, including a list of assets and liabilities.  He testified that he did not prepare Ex. 16, but

that it was prepared by FSA with the Jacksons' assistance. Ex. 16 lists a unit price of $10 per pheasant and a total of $20,420. J.C. testified that everything in Ex. 16 is simply their projections. On rebuttal Pitts disagreed and testified that the Jacksons were certifying in Ex. 16 the assets they actually had on hand, although Pitts admitted that it is hard to count birds.

Jenne took over servicing the Jacksons' loans from FSA in the Fall of 2004. Jenne testified that the Jacksons became delinquent on their loans to FSA on January 1, 2005. Jenne testified that he visited Jacksons' operation on January 14, 2005. He testified that the Jacksons told him in January 2005 that they were considering ceasing operations, and asked him what they could do with respect to their debt to FSA. They discussed voluntary liquidation and voluntary conveyance, but Jenne testified that they never discussed foreclosure.

Jenne explained that a "voluntary liquidation" is where a borrower voluntarily agrees to liquidate collateral and apply the proceeds against the outstanding loan balance. In comparison, a "voluntary conveyance" is where the borrower agrees to transfer ownership of security to FSA. Pitts testified that if a borrower offers to voluntarily convey title to FSA, it then decides whether it is in FSA's best interest to take the property[5]. "Debt settlement" occurs after liquidation and payment of proceeds to the debt. Jenne testified that the process of settling the remainder of debt owing after liquidation depends on a borrower's ability to pay, and the amount can be less than the debt.

Jenne and Pitts both testified that Jacksons did not ever offer to voluntarily convey their real property to FSA. Jenne testified that the Jacksons did not tell FSA to take back its security,

---

[5]Pitts explained that it might not be in FSA's best interest to take a voluntary conveyance, for example if there are liens against the property.

9

but that the Jacksons told him that they wanted to voluntarily liquidate.  He testified that the Jacksons thought that voluntary liquidation was their best option because they felt could sell their real property to pay most of the FSA debt.  Jenne testified that he agreed that decision was reasonable at the time, based on the information provided by Jacksons.  Jenne admitted that he worked with the Jacksons to prepare a liquidation plan, and he agreed that he never told the Jacksons not to sell the FSA's collateral.

Jenne testified that Jacksons called him and told him that they were no longer raising pheasants.  He explained to them that in order for them to be eligible for FSA loans they had to operate a farm or ranch.  Ex. 13 is a handwritten account by Jenne of his field visits to the Jacksons' home dated 1/14/05, 2/14/05, 2/15/05, and 8/2/05.  Ex. 13 provides a summary of the Jacksons' problems with their operation.

The 1/14/05 entry on Ex. 13 states:

Field Visit for YEA.  Met w/ borrowers at their home for scheduled YEA but they did not have their actuals for 2004 completed.  We spent the time discussing their financial difficulties and their proposed liquidation.  They have decided that they cannot continue in the business of raising and selling pheasants.  They have never been able to get to the 4500 birds they needed to be successful, and they are now at only 1000 birds, after beginning the year at 3500.  Some of the birds were sold during the first half of the year but others have had their necks wrung because borrowers have not been able to afford feed for them.  They have a delinquent feed bill with Pfaus [sic?] Pellet Mill in the amount of $13,299.82 and the mill has cut them off from buying more feed.  Feed costs went up during the year from $220/ton to $340/ton due to soybean shortage nationwide resulting from change in feeding practices resulting from mad cow (BSE) situation.   For the past 6 months, borrowers have been buying sacks of corn just to maintain the birds.  On corn only, the birds don't lay, so they have not had eggs or chicks to sell for the past six months.  It is taking 150 lbs. of feed a day at a cost of about $140 per week to keep the birds alive, and they are not getting any return on this ongoing expense.  They said they would be better off to kill the birds but they know they had to keep the security alive.  They also said they can't sell the birds until March-May because no one wants them during the winter months.  When they can sell them,

10

they think they could get $8 – 10 per bird.  $10,000 would not even cover their delinquent feed bill.

Other problems they have been faced with are the increase in propane costs from $1.00 to $1.50 – 1.75 per gallon and problems with shipping eggs and day-old chicks.  They use a lot of propane to heat brooders and incubators.  Most of their eggs and chicks are shipped via U.S. mail out of Missoula.  Delta Airlines pulled out of Missoula and ended its contract with the USPS, so smaller carriers had to be used to air freight out of the area.  Chicks were arriving at their destination a day late and most were dead.  The orders then had to be refilled, often with the same result.  Eggs were also arriving late and would not incubate.

Borrowers are now proposing liquidation of loan security.  It appears that a total liquidation of birds, equipment, and real estate would not satisfy the total FSA debt of $263,947.62 (principal) and $9321.58 (interest).  They want to keep 3 acres of the total 14 acres but know they might not be able to.  I explained to them that I would be sending Attachments 1 & 2 of Exhibit A to 1951-S Instruction which would lay out all their servicing options.  That gives them 60 days to either apply for servicing or begin voluntary liquidation.

In the meantime, borrowers are to get their records up to date so the YEA can be completed.

J.C. testified that the Jacksons spent between $350 to $500 per week on feed corn.  Each pheasant ate .25 lbs. of corn per day, and J.C. testified that if a day of feeding was skipped the birds would overeat the next day and choke to death.

Jenne's notes for the entry dated 2/15/05 on Ex. 13 state:

Phone call from J.C. Jackson returning my call.  He said they have been going through the 1951-S notices and they are still trying to decide what they should do.  I asked him if he thought it would be a good idea to try to get the birds sold now to another bird farm rather than feeding them through to the end of March when they can start selling them as release birds.  He said they have considered selling to another bird farm, and have even talked to a couple of them, but they would only pay about $5/bird compared to the $8 – 10/bird they could get later as release birds.  They have decided to keep feeding the birds and start selling them the end of March.  They are considering turning their operation into a vegetable truck farm and maybe raise turkeys on the side.  They really are not sure what to do.  They are still studying the 1951-S notices and will submit an application during the coming month.  They still anticipate either a complete or partial liquidation of

11

loan security with a possible leaseback or buyback.

J.C. testified that he told Jenne to have FSA take their farm back, but that FSA told them to keep FSA's security and that Jenne would start the process.  J.C. testified that he did not know the difference between voluntary surrender and foreclosure, but that they would have signed over the property to FSA and told Jenne to take the farm.  Eileen also testified that they often asked FSA to take back their farm.

J.C. testified that he called Jenne and told him that they cannot afford to feed their birds and that he wanted to kill them, but that Jenne told him they had to keep the birds.  J.C. testified that they took all their personal funds, including their autistic son's social security disability check and Eileen's income from making weighted blankets, to pay for corn to feed the pheasants. J.C. testified that their corn supplier did not cut them off, but that he decided to destroy the pheasants when they ran out of money and his truck was repossessed.

Ex. 14 is a letter from Jenne to Jacksons dated July 27, 2005.  In Ex. 14 Jenne demands payment of $58,500 for a total of 5,850 pheasants which were unaccounted for, or for their replacement with property of equal or greater value.  Jenne testified that FSA asked Jacksons for an accounting of its bird security.  He testified that he spoke with the Jacksons about their selling birds to other farms, and that he hoped and expected that Jacksons would sell the birds for $10 each and pay the proceeds to FSA, but that J.C. told him he could only get $5 for each bird.  He testified that Jacksons told him they were also eating the pheasants and their eggs.

J.C. testified that pheasants are very cannibalistic, and that when he ran short of corn the pheasants began eating each other and were dying in their pens.  It was then, J.C. testified, that he knew they were finished.  J.C. testified that he was afraid someone would report them for animal

12

cruelty if they saw the bloody birds. He testified that he did not have a buyer for any of the spent hens. J.C. disagreed with Jenne's statement in Ex. 13 that he wanted to hold his 3-year old birds. J.C. testified that he did not contact other pheasant farms about purchasing the spent birds because, he testified, pheasant farms do not buy 3-year old spent birds. J.C. testified that he told Jenne that he did not have any money left to feed the birds and wanted to kill them.

J.C. killed the remainder of the pheasants. Eileen testified that they had no alternative in 2005 but to kill the birds because they could no longer feed them. Jenne testified that J.C. told him that J.C. physically destroyed 1,226 birds by wringing their necks, but that Jenne had not authorized J.C. to kill any birds. Jenne did not agree that any of the Jacksons' birds were not FSA's security. Eileen testified that the 3-year old birds were not FSA's collateral, that the birds they destroyed in 2005 were 3-year old birds and that their destruction could not hurt FSA.

The 8/2/05 entry in Jenne's notes, Ex. 13, states:

Field visit for chattel check and discussion with borrowers regarding loan servicing and liquidation. I was accompanied on field visit by Dave Pitts, supervisory FLB for District 3. Chattel check was completed and all chattel items listed on 12/1/03 Security Agreement were seen and accounted for, but are not in use. All birds are gone and they had shut down as a pheasant operation. In response to my letter dated 7/27/05, borrowers prepared a sheet to account for the disposition of all birds. 2194 birds were sold through normal business operations during 2004, and another 200 birds were sold in April, 2005. Another 963 birds, or 25% of the flock, died during the breeding season as is normally the case. Another 1267 breeding hens were destroyed as 2 year old spent hens that could not be sold. These were not replaced because borrowers knew by then that the business was failing. Finally, another 1226 birds were destroyed because borrowers have not had resources available to purchase feed for them. The feed mill cut them off because they owe $14,000 that they are unable to pay. Proceeds from 2004 sales were used to pay feed bill and proceeds from 2005 sale were used to pay RE taxes. Dave and I decided that the destruction of birds serving as security property would probably not be worth pursuing with the US Attorney's Office or with OIG.

We discussed with borrowers our determination that they would not be eligible for primary loan servicing due to the fact that they are no longer operating a farm or ranch. They understand this and knew that they would be ineligible when they submitted their 1951-S application, having made the decision to not pursue alterative ag enterprises in a new plan of operation. All they are doing now, and all they plan to do, is make weighted blankets under the name of Dream Catcher Blankets. We discussed liquidation of assets serving as loan security. They expressed a willingness to do whatever they had to do to get out from under the debt. We advised them to contact local realtors to get an idea what the real estate would be worth. They said a neighbor has already expressed an interest in purchasing it. They will also start getting the work out that they have poultry equipment available for sale. We told them that we would be sending out Attachments 5A and 10A, "Notice of Intent to Accelerate" and we would start working with them to develop a liquidation plan for all security.

Ex. B is the FSA's "Notice of Intent to Accelerate" dated August 10, 2005, from FSA to the Jacksons. Jacksons filled out a Response, Ex. C, dated August 11, 2005 and checked the box requesting a meeting with the FSA servicing official.

Ex. 15 is an undated list of the disposition of pheasants to several persons, and the dates of the transfers totaling 2,394 birds. J.C. testified that they prepared Ex. 15 in response to Jenne's question about where the birds went. Ex. 15 states that another 963 birds died during the breeding season; 1,267 2-year old breeding hens are listed "as spent hens – not replaced," and 1226 birds are listed as destroyed[6]. After 2005 there were no farm pheasants on the property.

**Liquidation of Security.**

J.C. testified that Jacksons exhausted all their money feeding the pheasants. He testified that his truck was repossessed, that they needed money for food and need to move, so they started liquidating their pheasant farming assets which were FSA's security. He testified that FSA "was not doing anything" and was charging them $30 per day in interest, and that FSA knew they were

---

[6]J.C. could not explain the 41-bird discrepancy between the spent hens and the destroyed birds.

14

going to sell their equipment.

Ex. 3[7] is an appraisal of Rocky Mountain Hatchery's chattel property dated November 10, 2005, and signed by Jenne. Ex. 3 itemizes the equipment securing FSA's loan, and states the total value of the equipment in the amount of $47,100. Ex. 3 also includes photographs of the collateral. Jenne testified that he had been discussing liquidation with the Jacksons in 2005, that Jacksons wanted to sell their property as a working poultry farm, and that the primary purpose of Ex. 3 was to fix values of FSA's collateral in case Jacksons sold items of security separately. Jenne testified that Ex. 3 includes his personal opinion of the values of the chattel at the time, and that no pheasants were included in Ex. 3.

Ex. 2 is a list of hatchery equipment offered for sale, which was put together by Eileen. Jenne testified that most if not all of the items listed on Ex. 2 were security for the FSA loans. He testified that the asking prices for items listed on Ex. 2 did not correspond to the values listed for the items on Ex. 3. For example, the Gehl Skid Steer Loader is listed on Ex. 3 as having a value of $12,500, while on Ex. 2, item 7, the same item is listed at $14,500. J.C. testified that they increased the prices on Ex. 2 from the prices on Ex. 3 in order to give them room to dicker down to Jenne's values on Ex. 3[8].

J.C. and Eileen admitted selling equipment. J.C. testified that the proceeds were deposited into a savings account, and that Jacksons intended to give the money to FSA. However, Jacksons did not give FSA all the proceeds. J.C. admitted that FSA did not consent to Jacksons' keeping any proceeds from the sale of FSA security.

---

[7]Also Jackson's Ex. D.

[8]J.C. testified that some of the prices Jenne put for equipment on Ex. 3 were "ridiculous."

Ex. E is a "Notification of Intent to Accelerate or Continue Acceleration of Loans and Notice of Your Rights" dated June 14, 2006, which FSA sent to Jacksons. Ex. E states that FSA will accelerate the Jacksons' loans, that they were $35,744.00 behind in loan payments, that Jacksons sold or destroyed birds, and that they are no longer farming or ranching. Eileen testified that Ex. E illustrates delay by FSA which caused the interest on their loans to accrue.

Jenne testified that FSA's documents show that there was no application of sale proceeds to the Jacksons' FSA debt. However, that testimony is not consistent with FSA's Ex. 7. Ex. 7 is a note from Jacksons to Jenne and a check made out to FSA dated 10-2-06 in the amount of $341 signed by Eileen. The note on Ex. 7 states that the check is for sale proceeds of items listed on the FSA inventory form, and states that they may sell larger items including bins and the skid loader and that "hopefully more $$ will be on the way." That $341 payment is reflected on FSA's Ex. 8 as the last payment made by Jacksons on the FSA loan. J.C. testified that he told Jenne that they were selling FSA equipment security, and that Jenne knew.

Ex. 18[9] is dated February 7, 2007, and is titled "Notice of Acceleration of Your Debt to the Farm Service Agency and Demand for Payment of That Debt." Ex. 18 states the debt due is $263,947.62 unpaid principal and $32,888.81 interest, with interest accruing at the rate of $31.1306 per day. Eileen testified that their real estate was worth enough to pay off all of their FSA debt.

Walkup was a FSA employee from 1985 until 1997, when he left as county supervisor in Missoula. Walkup testified that he learned the Debtors were selling equipment, and he went to their property near Ronan to examine Jacksons' equipment. Walkup testified that J.C. told him

---

[9]Also Ex. F.

16

that the Jacksons were undergoing liquidation, and that Jenne was their FSA supervisor. When Walkup learned that it was a liquidation, he requested that J.C. call FSA and ask whether he should write the check to FSA. J.C. called FSA in Walkup's presence, asked the person from FSA who the checks should be written out to, and also asked how much prices could be reduced from the equipment lists. Ex. 1. Walkup testified that J.C. told him that the person from FSA said to make out the checks to RMH. Walkup purchased an incubator, egg baskets, cages and feeder bins and paid Debtors with a check in the amount of $2,802, dated March 25, 2007. Ex. 1. He wrote a second check in the amount of $120 on April 7, 2007. Ex. 3. Both checks were made out to RMH. On cross examination Walkup testified that FSA's rules change over time, so he did not question J.C. about his request that the checks be made out to RMH. Eileen testified on cross examination that Jacksons had FSA's approval to sell collateral. She denied telling Walkup that FSA was not a secured creditor.

J.C. testified that he sold the Gehl Skid Steer to James Ellis on July 23, 2007, for $8,000. Ex. 23. He did not tell Ellis that the Skid Steer was FSA's security, and Ellis did not ask.

Jenne testified that Jacksons originally listed their real property for sale at a listing price of $370,000, but they were unsuccessful in selling it. J.C. testified that the Jacksons interviewed 4 or 5 realtors, and decided to hire one who had sold their property three times before. J.C. testified that the realtor came to them with an offer to purchase the real property for $250,000 and told them to contact FSA, which is why J.C. sent FSA Ex. G. Ex. G is an undated letter from Jacksons stating their realtor's opinion that the property has a value in the $250,000 price range and requesting that FSA "consider an offer in the area of $250,000 as a settlement to all Rocky Mountain Hatchery's loan obligations with them."

17

Ex. 24[10] is a letter from FSA's attorney Darragh to Jacksons dated November 1, 2007.  In Ex. 24 Darragh describes the Jacksons' efforts to sell their property, but Darragh did not accept Jacksons' offer to accept $250,000 in full settlement of the Jacksons' FSA debt, which was stated as "around $310,000."  Ex. 24 estimates the current value of FSA's chattel security in 2007 at around $40,000.  Ex. 24 states that FSA would consider a proposed settlement only after a signed buy/sell was obtained, after which it would obtain an appraisal of the property to determine if the proposed settlement was adequate.  Eileen testified that their realtor told them that an appraisal would take too long and no one would wait.  Pitts testified that FSA requested a signed buy/sell agreement for Jacksons' property, but that FSA never received a buy/sell from them at $250,000 or any other amount.  Pitts testified that FSA did not want a sale of the property for $250,000 if its debt would not be paid off.

Jenne testified that the Jacksons, at some point, stopped trying to sell their real estate.  He testified that Jacksons were living on their property in 2006 and 2007, but that when he asked them if he could visit their property they refused and told him that it was inconvenient.

Ex. 17 is notes from a phone conversation dated April 8, 2008, between Jacksons and Jenne, at a time when Jenne was planning a field visit on April 14, 2008, to check on FSA's security.  Ex. 17 provides in part:

> When J.C. called, he began by saying that he doesn't have time for the appointment and he is done dealing with FSA because he was instructed in a letter from the U.S. Attorney's office that his case is now in their hands and Jackson's [sic] are to deal with that office only.  Without giving me a chance to respond, he went on for several minutes expressing his anger and frustration with the way his case has been handled.  He talked about how FSA turned down their offer to sell the real estate for $250,000 and settle the account, now costing them over $30 per

---

[10]Also Ex. H.

18

day in interest.  He talked about the "joker" (John Walkup) who has been pestering them about buying equipment and how he (John) has been getting personal private information about their case from FSA and he is not happy about it.  He said he doesn't care if the guy is an employee or former FSA employee or not, he shouldn't be getting information about his loan status.  He also said he was tired of spending money advertising equipment for sale, having people come out kicking around, and then leaving without buying anything, or even calling back. He said it has just been a waste of their time trying to sell equipment.  He didn't mention the fact that they had recently purchased some equipment from John Walkup.

When I finally got a chance to respond, I asked him if they intend to continue with the voluntary liquidation.  He said no, they are done and they are tired of it all. They are just going to wait for the day when they get foreclosed and someone tells them they have to leave.  He said again that they tried to sell the place but FSA turned the offer down.  I asked him if they had actually obtained a signed buy/sell agreement for the $250,000.  He said they did and they had a guy lined up to buy it for that amount but FSA turned the offer down.  I told him I was not aware they had a signed buy/sell agreement.  He said that they did.

I asked him if he would let me come out for a field visit.  He again said no, referring back to the letter from the U.S. Attorney's Office.  I told him I had not seen that letter and that it is still my understanding that FSA has some responsibility to service the loan account during voluntary liquidation.  His response to this was that there is no voluntary liquidation.  So I said there's nothing for sale then.  He said that's right, except for maybe the real estate.

On April 18, 2008, after Jenne visited the hatchery, he wrote the Jacksons about missing items of FSA's security, and he requested a list of items sold and amounts received, and any address where its security may have been moved.  Ex. 5.  Jenne testified that Jacksons did not ever tell him that they intended to keep sale proceeds for living expenses.  The Court questioned Pitts while he was testifying on rebuttal about the length of time between FSA's chattel inspections.  Ex. 5 is dated April 18, 2008, but refers to Jenne's "last visit" to inspect FSA's chattel which took place on January 31, 2007.  On May 16, 2008, Jenne wrote Jacksons a "Notification of Unauthorized Use of Proceeds" from the sale or disposition of equipment valued

at $20,670.  Ex. 6.  Jenne demanded payment or replacement of the property within 30 days.  Ex.
6.

J.C. testified that the proceeds from the liquidation of FSA's equipment were deposited
into their savings account[11], from which they intended to pay the proceeds FSA, but that under
the circumstances they needed the money to move.  Eileen also testified that they intended to pay
FSA the proceeds when they sold the chattel.  J.C. testified that he did not pay FSA some of the
proceeds because he had lost his pickup truck because he spent his money keeping FSA's
collateral alive, and they needed the funds to survive.

J.C. testified that Jenne asked them to sell more of FSA's security and they refused
because they didn't need any more, and that Walkup also asked them to sell him more items of
security but they declined.  Eileen testified that they had a chance to sell more collateral but did
not want to.  J.C. testified that they had just lost everything, but they enough proceeds with which
to move and survive on, and they did not wish to sell any more security.  When asked on direct
examination why they did not sell all of FSA's security at auction, J.C. answered that FSA told
them they would have to get 100% of the values FSA put on the security in order to sell at
auction.

J.C. testified that if they had been allowed to sell their real property they could have paid
FSA off, but that FSA would not cooperate.  He testified that they asked Jenne if they could tear
down the bird pens, but that Jenne refused and told them that they had to be sold with the real
property.  J.C. testified that FSA would not let them clean the property up.  According to J.C.,

---

[11]Eileen testified that the proceeds were first deposited into the RMH checking account,
then transferred to the savings account.

Jenne's refusal to let them clean up the property and sell it influenced them to abandon the real property.

Eileen testified that the Jacksons moved off the property on her birthday, August 3, 2007. She testified that they told Jenne that they considered it to be FSA's property. She testified that it had been a long time since FSA had visited the property or contacted them, like they had before. She testified that when they moved off the property they left behind several pieces of equipment, including several incubators, the Bobcat generator/welder, and the mobile home. She testified that the generator/welder was left in the barn, and that they did not take any FSA collateral with them when they moved.

Jenne did not know that Jacksons had abandoned their property for a year, until FSA discovered real property had been abandoned and took control of the property. Ex. I is a letter from FSA to Jacksons dated June 16, 2009, stating that FSA visited the real property and found the keys which they left. This corroborates the Jacksons' testimony at their § 341 meeting, Ex. 21, Transcript at p. 14, that Jenne and FSA had access to a key to the lock on the gate. In Ex. I FSA asks the Jacksons to maximize the sale amount "by cleaning up the property." Eileen was asked on cross examination by FSA's counsel if she cleaned up the property and she answered that they had asked Jenne years before if they could clean up the pens and he told them they could not.

Jenne testified that, after Jacksons abandoned their property, there were items of FSA collateral including vehicles and poultry equipment left on the property, and most items of FSA's security were gathered into one of the outbuildings for inspection. Ex. 19 is a "Summary Appraisal Report" dated October 30, 2009, of the abandoned property consisting of 14.35 acres

21

and outbuildings which was prepared for FSA by appraiser Paraic David Neibergs.  Ex. 19 at

page 5 estimates the value of the real property in the amount of $122,000.

Pitts testified that the Jacksons' real estate went to a foreclosure sale.  He explained that

in preparing a bid at a marshal's sale FSA requires a certified appraisal, and then performs a

technical review including encumbrances and sale costs.  Ex. 20 is a FSA "Worksheet for

Determining Farm Loan Programs Maximum Bid on Real Estate Property" dated December 21,

2009.  Pitts testified that Ex. 20 was used to set FSA's bid price.  Ex. 20 shows a maximum bid

calculated from the market value estimated on Ex. 19 less deductions for taxes and expenses,

with a maximum bid stated in the amount of $112,748.75 and an unpaid FSA balance in the

amount of $331,500.00.  Pitts testified that FSA bids either the market value of the amount of

FSA debt, whichever is less.  He testified that FSA bid the market price for Jacksons' property at

the marshal's sale, but was not the successful bidder.

Ex. 11 is a letter from FSA's farm loan specialist Marilyn Jo McMullen to Debtors'

attorney Pierce dated May 28, 2010.  Ex. 11 acknowledges that "most all of" FSA's security was

accounted for and sale proceeds were creditors toward Debtors' FSA account, except for several

items listed valued in the total amount of $20,791.  Jenne agreed that some collateral was left on

the property.

Jenne testified that the $1,500 listed on Ex. 11 as the value of "Robbins Incubator" was

for three (3) incubators at $500 value apiece, which values were taken from the chattel

appraisal/inventory on Ex. 3.  Ex. 3 was prepared in 2005.  Jenne testified that the values on Ex.

11 for the feed bins, Miller Bobcat generator/welder, Homelite generator, Gehl Skid Steer Loader

all were taken from Ex. 3.  Jenne testified that none of those items or portions therefrom were

turned over to FSA. Jenne testified that the incubators, feed bins, Bobcat generator/welder and Gehl Skid Steer Loader were not on the property at the time of his initial inspection after he learned that Jacksons were no longer residing on the property. J.C. and Eileen testified that they left the remaining security behind on the property when they left. Ex. 21.

Ex. 11 also lists a total of 5,850 hens, cocks and mature birds valued at $58,500, which it states J.C. destroyed. Jenne testified that no one at FSA was authorized to tell borrowers that they may sell FSA's security and keep the proceeds, that the Jacksons never told him that they intended to keep proceeds for living expenses, and that he did not authorize Jacksons to keep proceeds. He testified that Jacksons knew they were required to pay sale proceeds to FSA. Pitts testified that FSA does not have authority to release security, and that security must be sold and the proceeds applied against FSA debt. Pitts testified that he knew Jacksons sold FSA's security to apply against their FSA loan.

Jacksons filed their voluntary Chapter 7 petition on April 30, 2010. After the 11 U.S.C. § 341 meeting of creditors was held, the Trustee filed a no-asset report, but withdrew that and filed a notice of assets on October 4, 2010. Three proofs of claim have been filed.

FSA initiated the instant adversary proceeding on August 2, 2010, seeking denial of Debtors' discharge under § 727 and exception of FSA's debt from their discharge. The Chapter 7 Trustee is not a party in this adversary proceeding, and FSA did not call the Trustee to testify at trial.

Debtors' counsel asked Jenne repeatedly on cross examination whether he had any knowledge that Jacksons intended to injure FSA when J.C. killed their pheasants and failed to remit sale proceeds to FSA. Jenne answered that the Jacksons' intent was to sell FSA's security

23

without remitting proceeds, and that, to him, that was intent to injury FSA.

J.C. testified that he never intended to hurt FSA, but that he had just lost everything and just wanted to survive and FSA was not helping them. J.C. argued that he could not understand why he had to pay to keep FSA's collateral alive. He testified that he did not know that FSA would be injured when he sold its security. He testified: "I didn't think about it" and that he sold equipment "to feed my family." Eileen testified that they used approximately $7,000 in proceeds from the sale of FSA's security to buy food, pay deposits and rent, moving expenses and a truck payment. She testified that they did not intend to hurt FSA and did not know that FSA would be harmed. They were hoping that the sale of the real property would pay the FSA loan off completely.

Debtors' counsel asked Jenne on cross examination if he knew whether the Jacksons intended to support their family with the sale proceeds. Jenne answered that he knew the Jacksons had other income from the sale of blankets to support their family, and they did not need FSA's security.

## DISCUSSION

### I. Count Two – § 727(a)(5) – Failure to Explain Satisfactorily.

Certain general principles apply to FSA's Count II, which seeks denial of discharge under § 727(a). First, "[i]n keeping with the 'fresh start' purposes behind the Bankruptcy Code, courts should construe § 727 liberally in favor of the discharge and strictly against a person objecting to the discharge." *In re Retz*, 606 F.3d 1189, 1196 (9th Cir. 2010) (quoting *Bernhard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1281 (9th Cir. 1996)); *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (9th Cir. BAP 2005) (citing *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339,

24

1342 (9th Cir. 1986)).

The principal purpose of the Bankruptcy Code is to grant a "fresh start" to the "honest but

unfortunate debtor."  *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367, 127 S.Ct. 1105,

1107, 166 L.Ed.2d 956 (2007).  The "fresh start" is explained by the Ninth Circuit Bankruptcy

Appellate Panel *In re Albarran*, 347 B.R. 369, 379 (9th Cir. BAP 2006):

> The general policy of bankruptcy law favors allowing an honest debtor to
> discharge debts and to make a fresh start free from the burden of past
> indebtedness. *See Lines v. Frederick*, 400 U.S. 18, 19, 91 S.Ct. 113, 27 L.Ed.2d
> 124 (1970). Thus, because a debtor in bankruptcy is assumed to be poor but
> honest, there is a presumption that all debts are dischargeable unless a party who
> contends otherwise proves, with competent evidence, an exception to discharge.
> *See Brown v. Felsen*, 442 U.S. 127, 128-29, 99 S.Ct. 2205, 60 L.Ed.2d 767
> (1979); Hon. Barry Russell, BANKRUPTCY EVIDENCE MANUAL ¶ 301.60, p.
> 870 (2006 ed.).
>
> The corollary to this policy is that only the "honest but unfortunate" debtor
> is entitled to an entirely unencumbered fresh start. *Grogan v. Garner*, 498 U.S.
> 279, 286-87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

*Grogan v. Garner*, in further explaining the "fresh start" policy of the Bankruptcy Code,

states that "a central purpose of the Code is to provide a procedure by which certain insolvent

debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in

life with a clear field for future effort, unhampered by the pressure and discouragement of

preexisting debt.' *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230

(1934)."  498 U.S. at 286, 111 S.Ct. at 659.  The party seeking to deny the debtor's discharge

bears the burden of proof, which under § 727 is a preponderance of the evidence.  *Grogan v.*

*Garner*, 498 U.S. at 289; *In re Searles*, 317 B.R. 368, 376 (9th Cir. BAP 2004), *aff'd.*, 212

Fed.Appx. 589 (9th Cir. 2006).

FSA's second claim for relief, as clarified by the Court and admitted by FSA's counsel

at the beginning of the trial, is based upon § 727(a)(5) which provides that "the court shall grant the debtor a discharge, unless — . . . (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."  As a preliminary matter the Court notes that FSA, on page 7 of the Pretrial Order under "Relief Sought," suggests that the portion of its debt listed in Jacksons' Schedule F "which has not been properly accounted for in the approximate amount of $3,991.00 is not eligible for discharge."  In the Court's view § 727(a)(5) does not address exceptions of particular debts from a debtor's discharge like § 523(a).  Rather, the plain language of § 727 contemplates whether to grant a debtor a discharge, or to deny a discharge completely.  FSA's contention that $3,991 of its debt is not eligible for discharge under § 727(a)(5) is without merit under the plain language of the statute.  Jacksons oppose Count II and argue that they have explained satisfactorily all losses or deficiency of assets.

Under § 727(a)(5) the objecting party bears the initial burden of proof and must demonstrate:  (1) Debtors at one time, not too remote from the bankruptcy petition date, owned identifiable assets; (2) on the date the bankruptcy petition was filed or order of relief granted, the Debtors no longer owned the assets; and (3) the bankruptcy pleadings or statement of affairs do not reflect an adequate explanation for the disposition of the assets.  *In re Wright*, 364 B.R. 51, 79 (Bankr. D. Mont. 2007); *Ballew v. Ballew (In re Ballew)*, 18 Mont. B.R. 404, 417-18 (Bankr. D. Mont. 2000); *Huntington Center Partners, Ltd., v. Dupree (In the Matter of Dupree)*, 197 B.R. 928, 938 (Bankr. N.D. Ala. 1996); *Farmers Nat'l Bank v. Yokley (In re Yokley)*, 61 B.R. 198, 200 (Bankr. W.D. Ky. 1986).  Once the objecting party has met the initial burden of proof, the burden then shifts to the debtors to provide a satisfactory explanation for the disposition of

the assets.  *Ballew*, 18 Mont. B.R. at 418; *Wright*, 364 B.R. at 79; *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir. 1984).

In *Ballew* the Court found that the debtor's amendments to schedules and amended statement of financial affairs provided the requisite information to satisfy debtor's burden under § 727(a)(5) and denied the creditor's request for denial of discharge, "especially in light of the fact that objections to discharge are to be construed liberally in favor of the debtor and strictly against those objecting to discharge".  *Ballew*, 18 Mont. B.R. at 418**.**

*In re Lacounte*, 342 B.R. 809, 815 (Bankr. D. Mont. 2005) this Court quoted the Ninth Circuit decision affirming this Court in *Devers v. Bank of Sheridan (In re Devers)*, 759 F.2d 751, 754 (9th Cir. 1985):  "A debtor's failure to offer a satisfactory explanation when called on by the court is a sufficient ground for denial of discharge under section 727(a)(5)."  Applying these principles to FSA's claim for denial of discharge under § 727(a)(5), the Court finds that FSA has failed to satisfy its initial burden of proof under Count II by a preponderance of the evidence.

The evidence shows that the Jacksons moved from the real property on August 3, 2007. Eileen testified that they spent $7,000 in proceeds from the sale of FSA security on their moving expenses, food, deposits for rent and utilities, and a truck payment.  Otherwise, the evidence shows that Jacksons left FSA's security, and according to FSA's letter, Ex. I dated June 16, 2009, they left behind some of their own personal property as well.  The § 341 Transcript, Ex. 21, pp. 13-15, corroborates Eileen's testimony that they left FSA's remaining security locked in the barns when they abandoned the property.  No evidence exists in the record that Jacksons kept any of FSA's collateral except for the $7,000 in proceeds to which Eileen testified, after August 3, 2007.  FSA's Ex. 11 states in part:  "Most all of the Jackson's security property was accounted

27

for ....”  Keeping in mind that objections to discharge are to be construed liberally in favor of the debtor and strictly against those objecting to discharge, *Ballew*, 18 Mont. B.R. at 418, the Court finds that Jacksons have provided a satisfactory explanation for the disposition of FSA's security and proceeds which were not paid to FSA or surrendered by Jacksons.

Jacksons filed their Chapter 7 petition on April 30, 2010, more than two and a half years after Jacksons moved off the property.  They filed their Schedules and Statement of Financial Affairs with their petition.  There is nowhere on their Schedules where Jacksons were required to explain or account for the FSA security which they sold before abandoning their real property to FSA, or which calls for Jacksons to explain how they spent the proceeds of the FSA security.  On their Statement of Financial Affairs they were required to disclose repossessions, foreclosures and returns within one year immediately preceding the commencement of the case (Question 5), losses within one year immediately preceding the case (Question 10); and other transfers within two years preceding the case (Question 10).  None of these required Jacksons to account for FSA's security or proceeds therefrom which the evidence shows Jacksons either abandoned or spent more than two and one-half years preceding the commencement of the case.  The Court finds that this is too remote from the bankruptcy petition date for § 727(a)(5) to apply.  If the burden did shift to the Debtors, the Court finds that they have satisfactorily explained what happened to explain the disappearance of $7,000 in proceeds.

In addition, as discussed further below FSA did not exercise vigilance in protect its security.  A common maxim of jurisprudence provides:  “Vigilance.  The law helps the vigilant before those who sleep on their rights.”  Mont. Code Ann. § 1-3-218.  The Court noted at trial the long periods between FSA's chattel inspections, including inspections more than 13 months

28

apart from January 31, 2007, after Debtors were in default, to the next inspection shown by Ex. 5 as April 18, 2008.

The security agreement, Ex. 12, provides at page 6, Section IVB1b, that FSA may enter upon the premises and take possession of collateral.  "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible, subject, however, to the other provisions of this chapter."  MONT. CODE ANN. § 28-3-303.  "The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity."  MONT. CODE ANN. § 28-3-401.  Applying these rules of contract interpretation, the Court finds that FSA was not vigilant and did not act to protect or preserve its collateral as it was empowered to do under Ex. 12.  Instead, after learning that Jacksons were done with their pheasant operation, and that they wanted to sell their property, and even after J.C. told FSA that he wanted to kill all the pheasants, FSA did not exercise its rights under Ex. 12 and move to take possession of its collateral.  Instead, FSA allowed the Debtors to undertake a liquidation, and FSA went more than a year between chattel inspections.

The record does not show the source of FSA's program for voluntary liquidation and voluntary conveyance which was described at trial.  However, Ex. 12 is the signed security agreement setting forth FSA's rights to take possession of its collateral, and it does not provide for alternatives such as voluntary liquidation.  The record shows and the Court finds that FSA did not vigilantly avail itself of its contract remedies under Ex. 12.  For this additional reason, construing objections to discharge liberally in favor of the Debtors and strictly against FSA as the party objecting to discharge, *Ballew*, 18 Mont. B.R. at 418, the Court finds and concludes that FSA has failed to satisfy its burden under Count II to deny Jacksons' discharge under §

29

727(a)(5).

## II.  Count I – § 523(a)(6) – Willful and Malicious Injury.

In Count I FSA seeks exception from Jacksons' discharge of secured property which was sold, converted to Defendant's own use, or destroyed, in the approximate amount stated in the Pretrial Order as $75,300.00, under § 523(a)(6) which excepts from discharge any debt "(6) for willful and malicious injury by the debtor to another entity or to the property of another entity." *Barboza v. New Form Inc. (In re Barboza)*, 545 F.3d 702, 706 (9th Cir. 2008); *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202,1205 (9th Cir. 2001), *cert. denied*, 533 U.S. 930, 121 S.Ct. 2552, 150 L.Ed.2d 718 (2001).  Injuries resulting from recklessness are not sufficient to be considered willful injuries for exception for discharge under § 523(a)(6).  *Barboza*, 548 F.3d at 708, citing *Kawaauhau v. Geiger*, 523 U.S. 57, 60-61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998).

The Ninth Circuit reversed and remanded the case in *Barboza* because the courts below did not separately analyze the "malicious" prong of § 523(a)(6), and although some overlap may exist between the two prongs the Ninth Circuit requires a separate analysis for both the "willful" and "malicious" prongs.  *Barboza*, 545 F.3d at 711; *Jett v. Sicroff (In re Sicroff)*, 401 F.3d 1101, 1105 (9th Cir. 2005); *In re Su*, 290 F.3d 1140, 1144 (9th Cir. 2002); *Transamerica Finance Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 554 (9th Cir. 1991) (per curiam); *Jercich*, 238 F.3d at 1209.  Therefore this Court must analyze the willful and malicious prongs of § 523(a)(6) separately.  FSA has the burden of proof under § 523(a)(6) to except its claim from Debtors' discharge under both prongs.

Jacksons argue that they repeatedly notified FSA that they could no longer afford to feed the pheasants and had to sell collateral to feed the pheasants or they would starve, and FSA did

30

not object.  At trial both J.C. and Eileen insisted that the pheasants were 3 years old and not

subject to the security agreement.  Under the clear language of Ex. 12, Item 3, FSA's security

includes "All livestock . . . birds . . . produced or used for commercial purposes, . . . now owned

or hereafter acquired by Debtor, together with all . . . replacements, substitutions, and additions

thereto, including *but not limited to*" the specific numbers of hens and cocks listed on page 4 of

Ex. 12.  (Emphasis added).  The fact that 3-year old pheasants are not specifically listed on page

4 does not change the fact that they are FSA's collateral, because Ex. 12 states on page 1 that

"the following description of specific items of collateral shall not in any way limit the collateral

covered by this instrument and the Secured Party's interest therein[.]"  Thus, Jacksons are

incorrect in asserting that 3-year old birds were not FSA's security.

### A.  Willful.

An injury is willful under § 523(a)(6) if the debtor intends the consequences of his

actions.  *Geiger*, 523 U.S. at 61, 118 S.Ct. 974; *Albarran*, 347 B.R. at 384.  The Ninth Circuit

wrote in *Su*, 290 F.3d at 1144:  "The holding in *In re Jercich* is clear:  § 523(a)(6) renders debt

nondischargeable when there is either a subjective intent to harm, or a subjective belief that harm

is substantially certain."  Subjective belief includes actual knowledge that harm is substantially

certain to result.  *Su*, 290 F.3d at 1145-46; *Albarran*, 347 B.R. at 384.

Subjective intent may be gleaned from objective factors and circumstantial evidence

which tends to establish what the debtor must have actually known when taking the injury-

producing action.  *Su*, 290 F.3d at 1146 n.6; *Albarran*, 347 B.R. at 384.  Reckless disregard is

insufficient to establish willfulness under § 523(a)(6).  *Geiger*, 523 U.S. at 61, 118 S.Ct. 974; *Su*,

290 F.3d at 1145-46.  The Ninth Circuit wrote in *Su*:

31

> That the Bankruptcy Code's legislative history makes it clear that Congress did not intend § 523(a)(6)'s willful injury requirement to be applied so as to render nondischargeable any debt incurred by reckless behavior, reinforces application of the subjective standard. The subjective standard correctly focuses on the debtor's state of mind and precludes application of § 523(a)(6)'s nondischargeability provision short of the debtor's actual knowledge that harm to the creditor was substantially certain.

*Su,* 290 F.3d at 1145-46.

Count I seeks exception from discharge under § 523(a)(6) for Jacksons' sale of FSA's security and conversion of the proceeds for their own use, and for destruction of FSA's bird security. The evidence shows, as discussed above, that FSA knew that Jacksons were selling FSA's security but FSA failed to attempt to exercise its right under Ex. 12 to take possession of its security in order to preserve and protect it. FSA was content to permit the Jacksons to undertake a voluntary liquidation, which they did until they ran out of their own funds to keep the pheasants alive while they could be killed by J.C. Therefore, the Court finds that the sale of FSA's security, by itself, reflected neither a subjective intent to harm FSA, or a subjective belief that harm to FSA was substantially certain to result from the sale. *Geiger,* 523 U.S. at 61, 118 S.Ct. 974; *Albarran,* 347 B.R. at 384; *Su,* 290 F.3d at 1144.

With respect to J.C.'s destruction of the 5,850 pheasants shown by Ex. J, FSA knew or should have known that the killing of farmed pheasants is a common and normal characteristic of pheasant farms. J.C.'s testimony about the nature of pheasant farming is uncontroverted. FSA did not call any witness to testify as an expert regarding pheasant farming. The evidence shows that in the short life cycle of a farmed pheasant, nonproductive birds are culled and killed. Likewise sick and injured birds are killed. When a hen is spent, or a pheasant reaches their third year of life, a limited number are sold to a dog trainer, but otherwise they are all killed to prevent

32

the spread of tuberculosis to the entire flock.  In other words the evidence shows that the mere fact of killing pheasants is a normal and necessary part of pheasant operations.

However, at the time J.C. killed the remaining pheasants the Jacksons were no longer engaged in the business of selling pheasants.  Jacksons knew they were finished, and knew that they were obligated to care for the birds which were FSA's security under Ex. 12.  If Jacksons had walked away from the farm, equipment and pheasants earlier, before selling the collateral and killing the birds instead of partially liquidating and killing the birds before abandoning the property, then they would have left FSA with its contractual remedies.  In that event FSA would have had the burden of feeding spent birds, and liquidating its other security.

But Jacksons remained on the property.  They liquidated FSA's collateral and spent the proceeds keeping the birds alive only long enough for J.C. to kill them, and then abandoned the property and spent $7,000 of proceeds from the sale of FSA's security for moving and living expenses.  Given these facts the Court finds that FSA satisfied its burden to show that harm to FSA was substantially certain to result from Jacksons' actions in using the sale proceeds and killing the pheasants, and therefore finds that those actions were willful.  *Geiger*, 523 U.S. at 61, 118 S.Ct. 974; *Albarran*, 347 B.R. at 384; *Su*, 290 F.3d at 1144.

### B.  Malicious.

The "malicious" requirement is satisfied when plaintiff shows "(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse."  *Jercich*, 238 F.3d at 1209.  In the Ninth Circuit conduct must be both willful and malicious for a debt to be excepted under § 523(a)(6), and specific findings must be made that the conduct was willful and malicious.  *Barboza*, 545 F.3d at 706, 711.

33

FSA argues that the tortious conduct and wrongful act criteria for maliciousness can be satisfied under common-law conversion under Montana law, and the Jacksons' unauthorized control of the property of another resulting in damages when they destroyed assets. The Court will address Jacksons' use of collateral sale proceeds to feed the birds, J.C.'s destruction of the birds, and Jacksons' use of sale proceeds for their moving and living expenses separately.

**Feeding and Killing the Pheasants.**

Debtors contend that J.C. did the only thing he could do when he killed the pheasants which were starving and had begun cannibalizing one another after Jacksons spent all of their own funds on corn feed. Jacksons used some of the proceeds from the sale of FSA's security to feed the birds while he killed them. The Court considers Jacksons' use of sale proceeds to feed the birds wrongful, intentional, and that it necessarily caused FSA injury in the amount of the sale proceeds spent on corn feed. However the Court finds, based on the evidence, that the Jacksons had just cause or excuse to use the proceeds for feed.

J.C.'s testified in vivid detail about the condition of their pheasants after Jacksons exhausted their own funds on feed. The pheasants were starving. They were cannibalizing one another. Because of their age and condition he was unable to sell them to another pheasant farm, and there were too many to sell to the limited market of dog trainers. His testimony is uncontroverted.

J.C. spent proceeds from the sale of FSA's equipment security to feed the pheasants while he killed them. The security agreement, Ex. 12, Section IIIB(3) required Jacksons to "care for and maintain the collateral in a good and husbandlike manner." J.C. told Jenne specifically that he wanted to kill all the birds, but notwithstanding that knowledge FSA did not exercise its

34

remedies under Ex. 12 to take possession of the pheasants.

Jacksons sold no more of FSA's security than they needed to accomplish the killing and their move. The Court finds that their use of proceeds from the sale of FSA security to pay for corn to feed the pheasants while they were killed was with just cause and excuse, and therefore that use was not malicious. *Jerich*, 238 F.3d at 1209.

With respect to J.C.'s killing of the pheasants, the Court finds that FSA failed its burden of proof to show that the killing necessarily caused FSA injury. As stated above the evidence shows that, when J.C. killed the remaining birds, their condition was poor. They were starving, unproductive, past marketable age, and cannibalizing each other. No evidence exists in the record that the pheasants referred to in Ex. J which J.C. killed had any value. Indeed, the evidence shows that they had a negative value because the Jacksons had to feed them and could not sell them.

FSA valued the killed pheasants at the amount of $58,500 on Ex. J, based on a $10 per pheasant price set by the Farm & Home Plan. Ex. 16 is the most recent Farm & Home Plan in evidence, and it is dated 12/19/2003. The $10 price from Ex. 16 applies to breeding cocks and breeding hens, but the evidence shows that at the time J.C. killed the birds the Jacksons had ceased operations, the birds were at the 3-year age when they were "spent" and prone to contract tuberculosis. FSA offered no evidence of any positive value to the birds at the time and in the condition the birds were in at the time J.C. killed them. That lack of evidence weighs against FSA as the party with the burden of proof that the act necessarily caused injury. *Jerich*, 238 F.3d at 1209. If they had a positive value, the Court is reminded that FSA did not exercise its remedies under Ex. 12 and take possession of the pheasants after J.C. told Jenne that he wanted

35

to kill them.

**Use of Security Proceeds to Move.**

Jacksons argue that they surrendered most of FSA's security, and did not sell any more of FSA's security than they needed to survive. The evidence supports that argument. Jacksons contend that they asked FSA repeatedly to take their farm and found a buyer willing to pay $250,000, but FSA refused and ultimately sold the property at marshal's sale for far less. Even if true, that argument does not excuse their use of proceeds from the sale of FSA security for their moving and living expenses. Eileen testified that they used $7,000.00 in security proceeds for moving and living expenses, deposits for security and utilities, food, and a truck payment. No evidence exists in the record of any other amount used.

Jacksons knew that they were obligated under the note and security agreement to pay those proceeds to FSA, and they deposited the proceeds into their bank account with the intent to remit them to FSA. The Court finds that Jacksons' use of $7,000 in sale proceeds was wrongful, done intentionally, and necessarily caused FSA injury in the amount of $7,000.

Jacksons cite *Mountain West v. Long (In re Long)*, 2008 WL 2477456 (Bankr. D. Mont.) for the proposition that use of proceeds for personal use and to fund business ventures was not "malicious" under § 523(a)(6). That decision was reversed on appeal by the Ninth Circuit Bankruptcy Appellate Panel ("BAP") in an unpublished decision on February 12, 2009[12]. The BAP found that this Court committed "clear error" when it determined that the malice element of § 526(a)(6) was not satisfied by a creditor. The BAP wrote:

---

[12]The BAP's Memorandum is at Docket No. 97, Case No. 07-00026 on this Court's CM/ECF system.

> While Littleton may establish, under appropriate facts, that a good faith effort to
> continue in business with the purpose of paying the creditor constitutes "just cause
> or excuse" for spending an inventory financer's collateral proceeds, it does not
> establish that an effort to start a new business with the proceeds of the sale of a
> prior business constitutes "just cause or excuse," particularly where the secured
> creditor has not been advised the sale of its collateral, and does not know that its
> proceeds are being dissipated.

Memorandum, page 26.

Being reversed, this Court's decision in *Long* is no support for the Jacksons. The BAP decision is distinguishable in part because, in the instant case, FSA was advised of the sale of its collateral. The Court is mindful of the admonition that bad facts made bad law. The evidence shows that FSA sat on its rights, instead of exercising its remedies under Ex. 12, while the Jacksons exhausted their resources trying to keep the pheasants alive and sell their property while the interest on the FSA debt kept mounting. Because Jacksons spent all their and their son's funds preserving FSA's security, they felt justified in using the proceeds from the sale of FSA's security for their moving expenses. The Court agrees that FSA was not vigilant, but in light of the BAP's holding in *Long* the Court cannot avoid the conclusion that the Jacksons' use of $7,000 in proceeds from the sale of FSA's security was without just cause or excuse. Thus, Jacksons' use of the $7,000 in FSA security proceeds was malicious and FSA is entitled to judgment excepting that amount from Debtors' discharge under § 523(a)(6).

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334(b).

2. FSA's complaint to determine dischargeability of its debt and objecting to Defendants' discharge are core proceedings under 28 U.S.C. §§ 157(b)(2)(I) & (J).

3. FSA failed to satisfy its burden of proof for denial of Defendants' discharge under

37

Count II (11 U.S.C. § 727(a)(5)) for failure to explain satisfactorily loss or deficiency of assets to meet their liabilities.

4.  FSA failed to satisfy its burden of proof under 11 U.S.C. § 523(a)(6) by a preponderance of the evidence, to show that Debtors committed a willful and malicious injury to FSA or property of FSA when J.C. Jackson used proceeds from the sale of FSA security to feed pheasants, and then killed pheasants which were part of FSA's security.  FSA failed to show that the 3-year old birds which were destroyed had any value at the time J.C. killed them, and therefore FSA failed to show that the killing necessarily caused injury and was without just cause or excuse.  Jacksons' use of FSA security proceeds to buy feed for the birds was done with just cause or excuse.

5.  FSA satisfied its burden of proof under § 523(a)(6) by a preponderance of the evidence, to show that it suffered willful and malicious injury when the Jacksons took $7,000 in proceeds from the sale of FSA's security and spent it on food, rent, security and utility deposits, moving expenses and a truck payment.

**IT IS ORDERED** a separate Judgment shall be entered in conformity with above against the Defendants, in favor of Farm Service Agency ("FSA"), excepting from the Defendants' discharge the sum of $7,000 for willful and malicious injury under 11 U.S.C. § 526(a)(6), but dismissing Count II of the complaint.

BY THE COURT

*Ralph B. Kirscher*

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

38